Welcome, counsel, and we're ready to call our first case, the United States v. Quoron Chance. Mr. Dowling. Good morning, your honors. May it please the court. My name is John Dowling. I'm the attorney for the defendant appellant Quoron Chance. I'd like to reserve three minutes for rebuttal if I may. That's done. Thank you. We have raised two arguments on appeal, and I'd like to start with the second one, which is that Pennsylvania State Trooper Glenn Adams illegally prolonged the traffic stop and the Fourth Amendment seizure of Quoron Chance when he engaged in a series of protracted and unrelated lines of questioning. The unrelated lines of questioning began when? About two, I would say, if not immediately, about two minutes into to the the portion where Mr. Chance was seated. I think you forfeited that entire argument. Your entire position below was that the Rodriguez moment was at the end of the time in the patrol car, I believe. We have not forfeited that argument, Judge Bibas. Where did you preserve this argument? Where in the record did you preserve this argument? Well, our position is that the entire argument that the Pennsylvania State Trooper illegally extended the traffic stop, that that is our argument that under Rodriguez, he illegally he extended. OK, our jurisdiction, our our precedent says you not only have to preserve general issues, but particular arguments. Where in the record did you argue for a Rodriguez moment before the end of the time in the car? We did not argue for a Rodriguez moment earlier. OK, then then let's talk about I think you're stuck with the Rodriguez moment at the end of the time in the car. So why wasn't there probable causes of that time? Well, your honor, I don't think we're stuck with that because when we talk about forfeiture, my understanding is that under this court's decision in the United States versus Joseph with which the government cites in its brief in which we make reference to in our reply brief as well. This in that case, this court clarified the degree of particularity that a party has to for which party has to use to advance an argument on appeal. And my understanding is that under that case, it's a two part test. Your argument has to rely on the same legal rule, which here it does. It's still that under Rodriguez, the traffic stop was extended and then the same facts. And when you say the same facts, isn't that where you're in the hole, Mr. Dowling? Because it wasn't just that you didn't raise this argument below. It's that you explicitly identified the Rodriguez moment before the district court at the point that Judge Bibas has been talking to you about that. And when I say you, I don't know whether it's you or not, but your client representative in front of the district court said that's the Rodriguez moment. So if that's the statement that you made in front of the district court, that's what the district court depended on. And in discussing the matter with you, how can you come in front of us and say something different? I mean, isn't that a very definition? In fact, one might argue that's not just a forfeiture. It amounts to a waiver and knowing an intelligent statement about what you thought the record represented. So, Judge Jordan, just to clarify, this is that is not what the district court depended on. The district court determined that there was reasonable suspicion to suspect drug trafficking immediately. He did indeed. But stick with me. Right. The district court had that as part of the mix in front of it. And that was the position that was taken explicitly. So I don't want to spend all your time talking about something that it feels to me like you may or may have a little bit of an uphill battle on. Let's just assume for the sake of discussion that we thought the Rodriguez moment that you identified in the district court was the Rodriguez moment you're stuck with. And what's your best pitch at that point? OK, well, I would like to circle back briefly later on to to Joseph and forfeiture as well. But our best pitch is that the facts that the district court or that the government relies on for reasonable suspicion, if we assume the Rodriguez moment is at the time, Mr. Chance steps out of the car. The facts are generally these factors that you would find on the first page of the handbook in the police academy. They're not particular lies to Mr. Chance at all. But when they got into the car, the officer had not yet inspected, even inspected the papers. He had not run a computerized check and he not yet even issued a warning ticket. So it doesn't the Rodriguez moment when you begin to become concerned, assuming that it's not forfeited, the argument begin at the end of the time in the patrol car. Well, for Jordan's question, I was assuming that it did begin or the Rodriguez moment was. And did he did he not have reasonable suspicions at that point in time? No, he didn't, Your Honor. And that was what I was getting at to the extent that our position is that a lot of these general factors like high crime area using. Well, not so much. This is a high crime. I mean, he was coming from New York to Pittsburgh. He had suspicious travel plans that didn't seem to make a lot of sense. He's going to pick up his son, but then turn around for somehow six hours later, come back. He had previous drug related request arrest. Excuse me. He has he was on parole for a firearm conviction. He was evasive and incomplete in his answers. There was extensive nervousness and he was driving not his own car, but his cousin's car. And then, you know, the question about the plates being the type of plates that are sometimes used in connection with those who are drug running a new car with no identification on it other than, you know, as plain as can be. I mean, some of his criminal history. I mean, the moment that comes back, you got reasonable suspicion. You know, I disagree, Your Honor. I think that the criminal history, you know, when you ask a non lawyer about the criminal history, I don't know what level of particularity the district court or even Trooper Adams where they were expecting from somebody not well versed in the jargon of law. If you've been arrested for a weapon, I don't know that it should be required or taking a divide and conquer approach to these factors. Judge Amber laid out five of them. I added a sixth. Surely you can add them up and say, OK, traveling from New York by itself isn't reasonable suspicion. But you added this long trip with this quick turnaround time in a borrowed car with a fishy story and a criminal history, but an incomplete criminal history. At some point, this adds up to reasonable suspicion, which is not that high a standard. You know, Your Honor, we fronted that that that notion of divide and conquer in our opening brief, and we expressly said that we were not trying to do that. I think that even when you take these factors into consideration, I mean, one of them, the nervousness factor. I don't think the district court given as much weight to that factor as it did. I mean, Mr. Chance was sitting in the patrol car. Who wouldn't be nervous? It shouldn't have given as much weight. Right. The question we've got is when you say we're not doing divide and conquer, and then the next breath, you say you shouldn't give it as much weight to that. You shouldn't give as much weight to this. Aren't you, in fact, doing what you say you're not doing, which is saying, let's look at just this thing. And it was reasonable for the district court to say that the guy was really nervous. Well, why? Now it sounds like divide and conquer. You're going one at a time and questioning how the court may have weighed that. Well, now, why why should we not look more holistically and say the court could look at this and say, on the whole, the relatively low threshold of reasonable suspicion is met when you put all that together. Judge Jordan, I don't think there is intellectually a way to discuss reasonable suspicion without addressing one factor in. I mean, we can address several factors in the same breath. Well, then let's talk about nervousness. You don't like what what the court said about nervousness. But what's wrong with the district court saying, I've heard the evidence. I credit the police officer's testimony. The police officer's testimony is that this person was nervous, visibly nervous. Even after I had told them, you're not getting a ticket. Just come sit with me off the highway. And he's still obviously out of sorts and nervous. Why? Why? Why can't the district court make a factual finding that that's credible and that that adds to the mix? I think that the district court can make that factual finding. But our position is that the nervousness, the troop around created that nervousness who I'm I don't know who would who wouldn't be nervous sitting in the front seat of a patrol car. That's a very awkward way to conduct a traffic stop. I'm not you know, in cases that I've worked on, I'm not sure that I've ever seen that. I presume that the district court could at least have fairly interpreted this as more nervous than the ordinary person during a traffic stop. And we're reviewing that this kind of the underlying historical facts, clear error. Right. We have a deferential standard review on the facts. So how are we to displace that? Well, your your honor, the way you phrase it was that the district court could have found that this was this level of nervousness was amplified or exceeded the general level of nervousness that you'd expect to see from someone sitting in the patrol car. But the district court didn't find that the district court just found that what that trooper Adams credibly testified that Mr. Chance was nervous. And in the context of Adams having testified explicitly that I told him you're not getting a ticket, you're going to get a warning. You're not getting a ticket. So why isn't it reasonable for the district court to understand that and say this was a this was this was a trooper who was specifically trying to calm this person down and they wouldn't be calm down? Well, I mean, your honor, if our position is really that the district court or the trooper, they can't just add up a number of of facts that on their own don't really add too much to the equation. Well, that sounds like divide and conquer. Well, you know, your honor, there's really no other way intellectually to do it. You know, the government accuses us of doing that all the time, that there's really no other way to do it than to talk about the weight of each factor. I mean, it's it's totality of the circumstances. It's not how many factors can we pile on? Another one of the factors, this whole plain Jane Jeep theory. I mean, this, as we wrote in our brief, this should have been a nonstarter. I mean, you know, I would say the vast majority of people, what you're really saying is you're hinting at that there's profiling. No, actually, no, I'm not. But then explain the plain Jane aspect of the car. Isn't that part of you were saying this is sort of in the quote manual, either written or unwritten. And so why even bring that up, then, if it's if you're if you're not implying that there's something other than suspicion? I'm bringing that up because that is what the district court relied on to find that there was reasonable suspicion immediately of drug trafficking. And that's what the trooper articulated in his testimony at the hearing on the motion to suppress. And I think that that factor, we talk about the totality of the circumstances. We don't we can't stand here and just accept that every factor the district court pointed to is a is a factor that's appropriate to consider. I know it's totality of the circumstances, but again, the government can't just. Oh, I see that. No problem. Go ahead. That went very fast. The, you know, sort of the converse of divide and conquer is just pile up as many as you can. And the court will just find that. Well, you consider all of these. But I mean, the plain Jane vehicle theory, I mean, that is not sufficiently particularized, particularized. Well, it certainly might not be on its own. Nobody. I don't think anybody is arguing, Mr. Dowling, that, hey, you don't have a my kids in honor student bumper sticker on your car. Therefore, you're a criminal. Nobody's making that pitch. What we're what's being put to you is there's a whole suite of things that Adams presents to the district court. He says it's it is a common thing to use a very plain, like completely undistinguished vehicle. It is a common thing to have brand new plates because they are rolling this over. They don't want the same plates on a car. So they're getting new plates. And the J series is a brand new set of plates. And that struck my attention. It is. I noticed the guy's nervousness when he saw me. I watched the way he reacted when he saw my car. I watched the way he reacted after I told him, hey, don't worry, you're going to get a ticket. I saw, you know, I saw his criminal record. I saw his I heard his story. Nobody's saying that everybody who comes from New York is a is a criminal. Some people might say, but not everybody says that. They're the fact that he's coming from New York and he's got this quick turnaround. It's that whole set that is in front of the judge. Not one or two. Yeah. Driving a plane car wouldn't get you in trouble by itself. But how how how are we supposed to instruct a district court to apply the reasonable suspicion standard? Taking the approach you're suggesting, which seems to be to say lots of people drive plane cars. Lots of people come from New York and go to the western Pennsylvania. Lots of people have new license plates. Isn't the whole point of not allowing divide and conquer to allow a trooper and to allow a district court to say when you add stuff up, individual things that might not be an issue can be an issue. Your Honor, the reason why it's problematic to to find that there's reasonable suspicion at. The point that we're assuming is because it's not sufficient. It sweeps in way too many people. It's the you know, the trip to a lot of people share custody over children. And this the trip from New York to another city in a in a brand new Jeep. And by the way, I have to just have to mention this. You know, to the extent that the Jeep had a plate beginning with the letter J brand new plate was a brand new Jeep. And the trooper knew that council. I think it would be open to you to make a record in the district court that said, OK, their criteria are inconsistent or the probabilities are high or whatever. But you haven't made any such record. How are we to find this in the first instance on a deferential review? I'd be open in a future case to you're saying, well, when it's a plane car, they say plane car. When it's an adorned car, they say adorned car. When it's a J plate, when it's an old car. But with no record, how can you just assert that to us and expect us to take judicial notice of it? I would think our deferential standard review means you've got to overcome that. Well, your honor, I think that at a certain point. Well, first of all, the burden is on the government to establish that the stop and this decision were lawful. But to the extent that you you worry about relying on our comments and our argument about the plain Jane vehicle, the new license plate. I mean, at a certain point, you know, the government can't just say whatever, you know, drug dealers wear blue. I don't think we would need a remand or factual finding to realize that that there will be some extreme cases. And someone could mention a constitutionally permissional factor or something that we can play notice of. But wouldn't it suffice in writing this opinion to say, OK, your your client loses here. But we just want to remind district courts that if if the defenders want to come forward with such evidence, give them a chance to make a record. We just don't have a record here. And it's reasonable if the district court, based on the observation of the. The officer finds this credible, the district can do that, you know, without having to get evidence either way. And if you had made a different record, maybe the district would have to do more to to discuss why. Well, your honor, I respect disagree that it would be the onus would be on us to make a record to to rebut the assertion that the plain Jane vehicle theory was suspicious or the brand new Jeep or the license plate. I think that's that's should really be on the government because that is certainly where you are correct, that the government has to show reasonable suspicion. But it's a relatively low. It might be the lowest threshold that we have in the law. And so absent something calling that into question, we have relied on criteria like that in very many cases. And the Supreme Court has relied on criteria like that in very many cases. We're not saying you have to make a record, but if you don't make a record, you haven't given us reason not to follow this well settled course of jurisprudence. Well, I think your honor, it would be a mistake to credit the district court's reasoning that these factors can carry any weight in the totality of circumstance analysis. I'm not saying every factor, but I'm saying plain Jane vehicle and and brand new license plate. I mean, you know, this is like the lowest possible. I'm struggling to find the word. I mean, he could have said anything at that point, but I would be inadmissible at trial under rule for a one. No, if they'd be admissible at trial, why can't we consider them now? Well, because at trial, I mean, it's just a question of whether or not they have any tendency whatsoever. Why isn't that the same standard here? They have some tendency. The district court could potentially overstated if the district court made a ruling that like, oh, that brand new tag, that's enough because your honor at trial. The question would be whether or not this that evidence in quotes would have any tendency to make a fact more or less likely factual determination by the fact finder. The jury here, the court is engaging is it's a legal question as to whether or not those those facts amount to reasonable suspicion. And also still not trying to divide and conquer, but whether those facts carry as much weight. Again, it's not just how many factors the government can put together and pile up. I think that several of these facts really just don't carry any weight at all. And I don't think the burden is on us to make a record in the district court that a lot of people don't put bumper stickers on their cars. You know, I would just like to circle back briefly, your honor, to the forfeiting argument. Yes, your honor. Before you get there, just isn't there sort of an elephant in the room here? A police officer has a right to ask for consent to search the car and you could say no. But in this case, the your client said yes. Almost unequivocally. No. Well, I mean, he did say yes. But your honor, as we put in point three of our opening brief, it's very short, about a couple of sentences. We cite Florida v. Royer from the Supreme Court for the proposition that consent obtained during the time when someone is illegally detained. I mean, so we only went on that if the court if he was illegally detained, if the stop was prolonged beyond the mission of investigating for the traffic violation. But the total stop here was what, 19, 20 minutes? Yes, about 23 minutes, I believe. OK. And so and and we're saying at least as far as that the Rodriguez moment was hit at the end of the conversation in the patrol car. And how much time after that was there? Well, I mean, so that was at what, nine minute mark, maybe. I believe at the nine, nine, twenty seven, nine, twenty seven. So that is, you know, that's just too long. Your honor, respectfully, that's irrelevant under the Supreme Court decision. And Rodriguez even de minimis extension. No, but at the point is the mission, if the mission is complete at nine, twenty seven. But at that point, he has reasonable suspicion, a low barrier. What's the problem? Well, I think that I've already articulated why we disagree that there was a reasonable suspicion at the point of Mr. Chance getting out of the trooper's car. I don't know that I would have too much productive argument. Why don't you go back to the circle, back to the forefoot? Thank you, Judge. Thank you, Judge Ambrose. And I just want to quote briefly from United States versus Joseph. This you know, this court held that parties may within the bounds of reason reframe their argument as long as the substance of the argument remains intact. And then last year or so, you're saying changing a statement of that. The Rodriguez moment was at one point in time, getting out of the car to another point in time, much earlier in the stop that that's just a reframing of the same argument. I thought that's not a different argument. I don't think so, Your Honor, because this is that seems like vastly, vastly different because can you acknowledge that some things happened during the criminal background check and things like that that would add to reasonable suspicion? Yes, I can. OK, so if that's true, then that's not the same argument. That's a materially different argument because you would be eliminating things that the trooper said he relied on and which presumably the district court relied on. Right. The way you've characterized that.  Given how it's such a compressed time frame that what this court said in building off of Joseph in United States versus a brew in 2022, this court held that the main thing here is to make sure the district court had an opportunity to consider the argument. And I think the district court had ample opportunity to consider where to pinpoint the Rodriguez moment. I just want to just mention what the government said in its brief as well. I'll give you one more minute because we've got plenty and plenty of extra time here, more than you might even want it. But we'll give you a minute to wrap it up and you'll have your three minutes on rebuttal. OK, thank you, Judge Jordan. So I'll just say that I really do think if you take a close look or even just a cursory look at this court's decision, the United States versus Joseph. Same same legal rule. Rodriguez, same facts. Judge Jordan, the way you characterized it. Sure. You know, you could say that that eliminates some facts. The government itself admits that or recognizes rather that pinpointing the Rodriguez moment is not an exact science. I've listened to every single one of the oral arguments from this this court's published opinions on this issue. Oh, my God. And and and every time there's always a difficulty in deciding where to pinpoint the Rodriguez moment. I don't think the court should hold that you are stuck with that moment that you identify. I think that in this court's jurisprudence on forfeiture, the underlying principles that support those rules are not violated or disturbed in any way by just the government itself. And it's brief. 17 pages talking about different Rodriguez moment here, there. And then I would just like to add one very, very brief point, which is that the questioning in this case. So if the court does agree that the Rodriguez moment was earlier in the questioning, the questioning was off mission in both kind and in degree. We got to agree. OK. Thanks, Mr. Thank you. We're not here from counsel for the United States. Mr. McHale. Morning, your eyes may please the court. Matthew McHale for the United States. This court should affirm here. Cron chance was stopped driving somebody else's car on the Pennsylvania turnpike. And right from the start of the stop, he acted very much like he had something to hide. And as it turned out, he did a kilogram of cocaine and cash in a hidden trap compartment inside this third party vehicle. And while and while the trooper was working, conducting routine business at the traffic stop in that patrol car conversation, Mr. Chance gave evasive answers about his criminal history, which we're you know, we're we're thoroughly familiar with the background. You don't have to run through that for us. Mr. McHale wants to address straight on. Mr. Dowling's argument that this thing went off mission pretty quickly. And and maybe one could say, not surprisingly, off mission since the trooper very clearly admitted. He stopped the guy because he wanted to search because he thought he had drugs. The traffic stop was was hooked up. I mean, it was it was an actual real violation. But subjectively, that didn't have anything to do with what was going on. He was only going to get a warning was baloney. He wanted to search that car because he thought there were drugs. So should any of that matter? And wondering whether this guy went off mission from the jump, from the start? Your Honor, I would disagree that. I mean, number one, as this court has said, the trooper suggest subjective intention is not relevant to determining the Rodriguez moment or the constitutionality of the stop. Number two, in response to your question, I would bring up. Wait, wait, wait a minute. You lost me there because if the trooper officer, Adam said that none of his questions had anything to do with the reason why he stopped chance. You're telling me that's irrelevant. No, Your Honor, I would say a couple of things in response to that question that was elicited on cross examination. Number one, I I don't think that's accurate. If you look at the and if you listen to the recording of the traffic stop, he said it. So you're not going to get any traction on that. Mr. McHale saying, hey, don't listen to what he said. He swore under oath that the questions he were asking had nothing to do with the traffic stop. He said it straight up. So, you know, that's you. You argue what you want to argue. But but trying to say, hey, pay no attention to that man behind the curtain. That's just not going to help. I understand, Your Honor, but I would say two things. Number one, the context of those statements was made in response to a specific question about did you were you asking him about the traffic violations like thirty three ten or thirty three oh nine? The specific provisions of the Pennsylvania traffic code. And number two, I would say these questions in the patrol car conversation involved, I would say, ordinary travel plans in addition to criminal history questions, some limited criminal history questions. And it's clear under the precedent of this court and of Rodriguez itself that even if those are not directly related to, again, the traffic code provision or roadway safety, they are part of the traffic mission. And that absolutely includes and the United States versus Hunter from last month made this crystal clear questions about criminal history because that has to do with officer safety and trooper. And on that point, on that point, Mr. McKay, I'm glad you brought that up. Don't our precedents say something about you have to have some safety concern? You have to have some legitimate safety concern in order to extend a stop by by performing a criminal background check. Yes, your honor, the precedents do talk about safety and I was so so where what in in this sequence of events do you point to to say, well, this guy had a legitimate safety. There was a safety concern that warranted running the criminal background check. Appendix 265, your honor, the trooper Adams testified that he always asks and he said this on the video as well, that he always asks about prior arrest records and he says officer safety is one reason for him to do that. So what you're saying is what you're saying is when when our precedent says you have to have a reason as a true safety reason to run a background check. But Trooper Adams says, I always do it because I always am concerned about my safety, that that's enough. A trooper can say, I'm always concerned about safety so I can always run a criminal background check that that's the government's position. Not necessarily, I mean, I think it does depend on the circumstances of each individual. Give me the circumstance because the only thing you've told me is officer Adams Trooper Adams said he always does it. How is that consistent with our rule, which is, you got to have a reason. If the reason is, I always do it then there's no then that eviscerates eviscerates our rule right. I wouldn't agree with that, you know, I mean, this is, this is, in this case, he is alone on the side of a road, which is a somewhat tricky situation with a driver who he doesn't know. He invites the driver back to his car for entirely valid reasons, both drivers safety. I'm sorry, can you can you create a safety situation, and then point to it and say I'm okay. How's that consistent with our, our opinion in hurt if it's what your argument is, he had a heightened safety concern because he was in his in the car with the defendant. He created the situation, we said in hurt you can't create a situation, call it a safety issue, and then do what you couldn't otherwise have done. Sure, your honor and I recognize that this court's opinion hurt, I think, found fault with the sort of offer officer created exigency by climbing in the, you know, passenger cab of that vehicle. However, in this case, and this goes back to the forfeiture issue. Because, again, below both sides agreed on the Rodriguez moment being at the end of the patrol car conversation and the reason I mentioned that is because that is a very significant concession that up till that point, trooper Adams was conducting the routine business at the traffic stop. In addition to other independent inquiries that he was making, and I would say that, I guess, one way I would sum up this, this case potentially is that the Fourth Amendment does not, you know, prohibit a state trooper from, you know, if walking is conducting routine business at the traffic stop, you know, the Supreme Court said in Arizona v Johnson, and this court has said in Garner that independent inquiries at the same time are entirely valid. And so you're at the end of the day, the position that the government Scott is really is. Hey, they admitted the Rodriguez moment. They're stuck with that Rodriguez moment. So, make them live with it. And if you make them live with that, then, then all the stuff that happened before that, they've admitted was on mission, effectively. And therefore, don't worry about the criminal background check don't worry about those other things because they he had reasonable suspicion. By the time chance got out of the car. Is that a fair summary where you are. No, I wouldn't quite characterize it that way because I think in the government took this position below and continues to take this position. And there's, there's a good reason why Mr chance picked the Rodriguez moment below, as the government did as well and that's because of the factual record that demonstrates through the troopers testimony that he was continuing to work on the business at the traffic stop, while the while the patrol car conversation was going on, which the conversation itself lasted, maybe a little bit more than five minutes I mean I counted it it's like five minutes and 45 seconds, the entire period of time from. I'm sorry. Yeah, five or six minutes but I'm just trying to get to a, you know, we're gonna have to write something in this case, and, and I thought your primary position was maybe I'm wrong about this is, you don't have to get into all of that, because they admitted it. They forfeited all that. And once you start measuring from the time, the chance gets out of the patrol car, at that point, he clear the trooper clearly has reasonable suspicion. Now if I'm wrong about your primary argument, straighten this out or straighten me out I don't want to attribute my ignorance to my colleagues and tell us what your primary argument is your honor I'm sorry, that is my primary argument and that's how I would start the opinion. I mean that is the first thing that I think I would say, and I would just point out that alternatively, we're not, we're not simply relying on a, you know, a waiver or or forfeiture here to kind of close the book on, you know, what happened during the patrol car The defendant here, as the government did have the benefit of all the testimony, all the evidence that was elicited in that suppression hearing. And after that evidence came in. But again, both parties agreed, okay, here's when we can say the Rodriguez moment occurred, and then the government would certainly take the position that, as you know I think as some of the questions from from your honors were suggesting, there was absolutely reasonable suspicion at that point of an independent, you know, drug trafficking offense at that point, I would add, let's talk let's talk about that second right because that, you know, we peppered Mr Dowling but explain to us why there's reasonable suspicion. Lots and lots of people drive cars without bumper stickers new cars, usually do have new license plates on them. People, sadly, get divorced and have children in other states and they have to go pick them up. And the fact that they're going to pick them up and bring them right home. You know, maybe there's something going on at home, what, what is so crazy about the idea that I'm picking my son up and I'm going to go home with him. What's you go on traveling on 500,000 people a day travel on the Pennsylvania Turnpike on the average. Yeah. And anybody gets stopped by a police officer or a traffic violation is going to be nervous. I mean, that's just normal human behavior. Why don't, why should we look at this suite of behaviors and say, I mean, reasonable suspicion. I think, I think what's kind of I don't want to put words in Mr Dowling's mouth but I get the sense that the argument being put to us is this is after the fact justification because they did find the trooper did find drugs, but this is just a, you know, this be any schmo in a car in a Jeep, it happened to be that he had no reasonable suspicion he had a gut instinct and he turned out to be right but that's not enough. That shouldn't be the law. Your Honor, I would start with the factual findings made by the district court that this court, you know, have to apply a deferential clearly erroneous standard review to, and I would start with this trooper is an experienced law enforcement agent specifically trained at highway interdiction with hundreds of hours of training, and dozens of stops, including many, many stops, where he found hidden trap departments, and his testimony, which, you know, was credited by the district court and and Mr chance on appeal explicitly said they're not he's not challenging factual findings. His testimony was found to be entirely credible and one of the things he testified was that, yes, he acknowledged that drivers can be nervous, and that that's normal for a driver to be nervous, but Mr chance he found was extremely nervous. His hand was shaking and nervousness did not go away in any way but only got worse. Even after the trooper told him he was just going to give him a warning and let him go. So, I would start with nervousness and that very, you know, sort of on the ground practical reality that the trooper was aware of and paying attention to what I think is a little bit harder, you know, even for a district court and then on you know on the appellate court for for that for the court to challenge or to sort of question. And in addition, there were multiple other circumstances I mean, as, as the court as we've discussed the totality of the circumstances of the test here and not dividing and conquering. But I would also go to, you know, Mr chances evasiveness about his criminal history. The transcript in the suppression hearing made clear at pages, you know 130 to 131 trooper Adams testified that when he asked Mr chance the question about, have you ever been what he said, a weapon, which is a little, you know, imprecise, both because it was a firearm, specifically, and because he did not mention the fact that he had been also convicted of heroin trafficking and assault and some other offenses to. So, those are probably the main factors I would point to and that we have pointed to in our brief, but in addition, again, trooper Adams testimony was that his training and experience should told him that the other things were also significant including the travel I would suggest to his response when asked about that was a little evasive as well. When trooper Adams asked him, you know, is this your car and he said no and then the trooper out and said well who's is it and chance responded, Jamel, and then there was some further probing necessary to flesh out, you know, who this person was and where that person's located. I see that my time is up. All right. No, I don't think we have any questions. It was okay. Thank you, Mr McHale, we'll hear from Mr Dowling on rebuttal. As to forfeiture. I think it's, we're talking about the question of the application of the law, the really the same set of facts. There's no in this compressed timeframe of a matter of a few minutes isn't your best argument that the government is not relying on forfeiture. That's exactly right. We paraphrase the 41 questions you just look at on their face. They're unrelated to the mission of a stop we're not relying on subjective intent with what the officer was thinking when he was asking the question just on their face. Many of these questions are off mission as a matter of law, not answer Mr McHale's point that the courts have said it's in Arizona case from the Supreme Court and other cases that you can you can be do you can have a conversation with somebody, while you're doing on mission things to stop. It's possible for two things to be happening at the same time, so that you're on mission, and the other things that are happening, whether they're directly on mission or not suddenly convert the on mission time into Rodriguez bad time. I like the way you characterize that your honor and I will tell you that it did it certainly this off mission question certainly did prolong duration of the stop, and this is the it's three facts that are tied together that that form that conclusion, a trooper Adams testified that he was looking for driving record vehicle registration and criminal history, he said, all three of those checks are embraced in the same database the so called clean next check. He did that and then he also testified that about two minutes into the stop. He is, and I'm going to give you record citations in a moment, testified that got the criminal history back, which means he got everything back because he said under oath it's all the same database, and then he was questioning chance about the criminal history, based on what he found on the database search, that's a joint appendix 130 131 and 184. And critically, in addition to testify that he was, he had already been punching in the registration check while he was telling chance before they even sat in the car together. So the argument that, well, the government, the, you know, chewing gum walking at the same time. Well, no, the trooper was certainly completely had already completed these records that's your, your conclusion about how much time you think it should have taken right. Is there anything in the record on that. Well, I mean you gave me some record sites that that said, it's all in the same database but your assertion is that it must have come back quickly had to come back in the first couple minutes. Right. Absolutely, because you look at the questioning the criminal history questioning comes up quite early, and then there's another several minutes so that. Yeah, good. No, just the relief that we're seeing is that we requested this court reverse the order denying the motion is press vacate the judgment of conviction and remand to the district court. Okay, thank you. Thank you, Mr. Dowling Thank you, Mr. McHale, we've got the matter on her advisement, we'll go ahead and call the meeting adjourned.